# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

FERNANDO RODRIGUEZ,

    Plaintiff

v.

JOHN KEAST, et al.,

    Defendants

Case No.: 3:24-cv-00218-MMD-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 9

    This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

    Before the court is Plaintiff's motion for a temporary restraining order (TRO) and preliminary injunction (PI). (ECF No. 9.) Defendants filed a response. (ECF Nos. 17, 17-1, 17-2, 25, 25-1 to 25-3, errata at ECF Nos. 31, 31-1.) Plaintiff filed a reply. (ECF No. 20.) The court held a hearing on September 27, 2024. (ECF No. 30.)  Defendants have provided several court-ordered status updates concerning Plaintiff's medical conditions. (ECF Nos. 35, 40, 40-1 to 40-2, 42.) Plaintiff filed a response to the first status update. (ECF No. 37.)

    After a thorough review, it is recommended that Plaintiff's motion for a TRO or PI be denied without prejudice.

## I. BACKGROUND

    Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (First Am. Compl., ECF No. 12.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id.*)

The court screened Plaintiff's First Amended Complaint (FAC), and allowed him to proceed with Eighth Amendment deliberate indifference to serious medical needs claims: (1) against John Keast, Joseph Benson, Issacson (identified by the Attorney General's Office as Jessica Rambur)[1], Christy Coss, and Kenneth Williams related to the alleged failure to provide him with recommended cataract surgery and now he is blind in both eyes; and (2) against Keast, Rambur, Coss, and Does 5, 6, and 7 (when he learns their identities) related to the failure to schedule a required stress test in order to complete the necessary extractions of numerous teeth. (ECF No. 11.)

Plaintiff filed an emergency motion for TRO or PI seeking an order to provide him with cataract surgery in both eyes to restore his sight, and to provide him with oral surgery to remove rotten teeth in his mouth and give him dentures for the missing teeth. (ECF No. 9.)

The court granted Plaintiff's motion for appointment of counsel and has referred this case to the Pro Bono Program. (ECF Nos. 29, 30.) The court held a hearing on the motion for TRO or PI and required Defendants to provide status updates regarding Plaintiff's cataract surgery and cardiac evaluation relative to his recommended dental extractions. In Plaintiff's response to one of the status updates, he states that an institutional dentist within NNCC could pull his teeth over several months by using a local anesthetic as opposed to general anesthesia. He asks the court to order him to be evaluated for extraction of his teeth at NNCC. According to the latest status update, Plaintiff has been scheduled for cataract surgery[2] and a cardiology consultation for the purpose of evaluating Plaintiff's ability to withstand local or general anesthesia for his dental extractions has been ordered and is expected to occur within the next 30 days. Defendants assert

---

[1] Rambur's maiden name was Issacson. (*See* ECF No. 33.)

[2] The date of the scheduled surgery was provided to the court *in camera*.

that Dr. Dryden, an outside dental provider, determined the dental extractions can be performed under local anesthesia, but given Plaintiff's complex cardiac comorbidities, cardiac clearance is required even for local anesthesia. (ECF No. 42.)

## II. LEGAL STANDARD

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Injunctions and temporary restraining orders are governed procedurally by Federal Rule of Civil Procedure 65, but case law outlines the substantive requirements a party must satisfy to obtain an injunction or restraining order. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) ("[T]he general availability of injunctive relief [is] not altered by [Rule 65] and depend[s] on traditional principles of equity jurisdiction.").

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted). The instant motion requires the court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20 (citations omitted).). The Ninth Circuit has held that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support the issuance of an

injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (citation and quotation marks omitted).

The Prison Litigation Reform Act (PLRA) mandates that prisoner litigants must satisfy additional requirements when seeking preliminary injunctive relief against prison officials. The PLRA provides, in relevant part:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2). Thus, the PLRA limits the court's power to grant preliminary injunctive relief to inmates. *See Gilmore v. People of the State of California*, 220 F.3d 987, 998 (9th Cir. 2000). "Section 3626(a) therefore operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators—no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Id.* at 999.

A temporary restraining order is appropriate when irreparable injury may occur before the court can hold a hearing on a motion for preliminary injunction. *See* 11A The Late Charles Alan Wright & Arthur R. Miller, et. al., *Federal Practice and Procedure*, § 2951 (3d ed. 1999). The standard for issuing a temporary restraining order is identical to the standard for a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *see also* 11A The Late Charles Alan Wright & Arthur R. Miller, et. al., *Federal Practice and Procedure*, § 2951 (3d ed. 1999) ("When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed

4

does not differ functionally from that on an application for preliminary injunction and the proceeding is not subject to any special requirements."). A temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 439 (1974).

### III. DISCUSSION

To obtain injunctive relief, along with demonstrating a likelihood of irreparable harm, the balance of equities tips in his favor and injunctive relief is in the public interest, Plaintiff must demonstrate he is likely to succeed on the merits of his Eighth Amendment claims.

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when

a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *Stewart v. Aranas,* 32 F.4th 1192, 1195(9th Cir. 2022) (citing *Shapley v. Nev. Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir. 1985)); *McGuckin*, 974 F.2d at 1060.

**A. Cataracts**

On October 10, 2022, Plaintiff was diagnosed with visually significant cataracts and referred to ophthalmologist Dr. Wolff "ASAP" for cataract surgery. (ECF No. 25-1 at 86.) On October 13, 2022, Dr. Benson requested that Plaintiff see Dr. Wolff "ASAP" for significant cataracts. This was authorized by the Utilization Review Committee (URC) on December 20, 2022, with a notation that Plaintiff was seen on January 26, 2023. (ECF No. 25-1 at 32.)

Plaintiff sent a request to Keast on December 12, 2022, asking whether he was approved for cataract surgery. Plaintiff was told the ophthalmology consultation for cataract surgery was pending URC approval, and it was requested that it be expedited. (ECF No. 12 at 21, 23.) Plaintiff sent another request on December 22, 2022, asking to be submitted again to the URC

for urgent cataract surgery. He was told that it was pending authorization and scheduling. (ECF No. 12 at 24.)

On January 12, 2023, Plaintiff sent a request to Keast asking when his cataract surgery would be approved as he could no longer see. He was told that it was approved by the URC on December 20, 2022, and he would be scheduled soon. (ECF No. 12 at 26.)

Plaintiff saw Dr. Wolff on January 26, 2023, for his cataracts. Dr. Wolff recommended cataract surgery in the left eye first and then the right eye. (ECF No. 25-1 at 76-79.)

Plaintiff sent a request to Keast on February 17, 2023, asking if he had been scheduled for cataract surgery. (ECF No. 12 at 28.) He sent another kite to Dr. Benson on February 19, 2023, stating that Dr. Wolff had recommended urgent cataract surgery, and requested that Dr. Benson submit him for the surgery. (ECF No. 12 at 30.)

On May 15, 2023, Plaintiff sent Dr. Benson a request for eye drops, sunglasses, a walking pole and vest because he kept bumping into people while walking. He was told he was pending scheduling. (ECF No. 12 at 32.)

Plaintiff saw the optometrist on May 18, 2023, who noted that Plaintiff had mature cataracts, and recommended surgery "ASAP" as Plaintiff was at high risk of falling and was functionally blind until he had surgery. (ECF No. 25-1 at 67.) Plaintiff sent a request to Dr. Benson that same day asking him to approve the double cataract surgery "ASAP." He was told that the authorization just came through, and he was in the queue of those to be scheduled. (ECF No. 12 at 34.) That same day, Dr. Benson requested that Plaintiff have cataract surgery with Dr. Wolff "ASAP," noting Plaintiff was now essentially blind and a fall risk. The request was authorized by the URC on May 24, 2023, with a notation Plaintiff was scheduled on September 14, 2023. (ECF No. 25-1 at 33.)

7

Plaintiff filed an informal level grievance that on June 1, 2023, advising that he had still not had the recommended cataract surgery. Rambur responded on June 20, 2023, that it was pending scheduling. (ECF No. 12 at 48.)

On August 2, 2023, Plaintiff sent a kite to the optometrist noting he could not see or read. He asked for a magnifying glass. He was told that he was scheduled for left eye cataract surgery and that a magnifying glass would not help him. (ECF No. 12 at 36.)

Plaintiff saw Dr. Wolff again on September 14, 2023, for his age-related cataracts in both eyes. He was described as having blurry vision, difficulty reading and seeing, halos that are moderate in severity, which were significantly impacting his vision. Dr. Wolff recommended that Plaintiff be scheduled for cataract surgery, first in the left eye and then the right eye. (ECF No. 25-1 at 48-50, 58.)

Dr. Benson requested the cataract surgery on September 19, 2023, noting that Plaintiff's vision was significantly affecting his activities of daily living. This was authorized by the URC on October 4, 2023. (ECF No. 25-1 at 39.)

Plaintiff sent a request on September 25, 2023, asking when he was scheduled for cataract surgery. (ECF No. 12 at 38.)

Plaintiff saw Dr. Wolff again on December 26, 2023, who noted Plaintiff's symptoms had worsened since his last visit. Dr. Wolff once again recommended cataract surgery for both eyes as the cataracts are significantly impacting Plaintiff's vision. (ECF No. 25-1 at 23-25.)

Plaintiff filed a first level grievance on February 20, 2024, noting he had been waiting for this surgery since December 2022, and was blind and could not read. Coss responded on February 27, 2024, that Plaintiff was seen by the doctor, and they were waiting for approval and then the surgery would be scheduled. (ECF No. 12 at 50-51.)

1    Plaintiff submitted a second level grievance which Williams responded to, noting

2 Plaintiff was still pending approval and scheduling. (ECF No. 12 at 54.)

3    Plaintiff saw the optometrist on March 28, 2024, and he was assessed with mature

4 cataracts with decreased visual acuity loss. It was recommended that he be referred to Dr. Wolff

5 "ASAP" and be given a cone for the loss of vision until he has surgery. (ECF No. 25-1 at 22.)

6    Plaintiff filed this lawsuit on May 22, 2024, and the motion for injunctive relief on July

7 29, 2024. The court screened the amended complaint on August 5, 2024. Up to that point,

8 Plaintiff still had not received the recommended cataract surgery. It took the court holding a

9 hearing on Plaintiff's motion, requiring the attendance of the Chief Deputy Attorney General and

10 NDOC's Medical Director Kenneth Williams, to have any further action taken.

11    After the September 27, 2024 hearing, Plaintiff saw Dr. Wolff for a follow up on October

12 7, 2024, and Dr. Wolff determined that Plaintiff did not need a cardiac stress test to undergo

13 cataract surgery. (ECF No. 40-1 at 4-7.) Dr. Benson requested the cataract surgery on an urgent

14 basis the following day. (ECF No. 40-1 at 2.) The surgery was still not scheduled. The court

15 required another status update be provided (ECF No. 39), and in response to this it was disclosed

16 that Plaintiff has in fact been scheduled for cataract surgery in the near future. (ECF No. 42, *in*

17 *camera* submission.) The court has ordered that a further status update be provided in 45 days

18 regarding the outcome of Plaintiff's surgery. (ECF No. 44.)

19    The evidence suggests Plaintiff likely to succeed on his Eighth Amendment claim

20 relative to his cataracts. There has been a significant delay in providing Plaintiff with

21 recommended cataract surgery, and Plaintiff's vision has continued to deteriorate.

22

23

1    Nevertheless, given that Plaintiff is now affirmatively scheduled for cataract surgery, it is

2    recommended that Plaintiff's motion for a TRO/PI be denied without prejudice as he has now

3    secured the requested relief (scheduling of cataract surgery).

4    **B. Dental Extractions**

5    On April 29, 2021, Dr. Peterson noted that Plaintiff needed extractions of the following

6    teeth: 3, 4, 7, 10, 12, and 14. (ECF No. 25-3 at 3.) On September 23, 2021, he was referred to the

7    oral surgeon regarding the following teeth: 1, 3, 4, 6, 11, 12, 14, and 19. (*Id*.)

8    On March 25, 2023, Plaintiff sent a request to the dental department noting that before

9    the pandemic he was to have all his top teeth removed, which were now rotten and causing him

10   pain. He asked for the teeth to be extracted or evaluated as soon as possible. He was told he was

11   on the dental list. (ECF No. 12 at 56.)

12   On April 5, 2023, Dr. Robert Houchin requested referral to an oral surgeon to complete

13   extractions of teeth 1, 3, 4, 6, 11, 12, 14, and 19, noting that Plaintiff needed full maxillary

14   denture and a mandibular removable partial denture, and he had an extensive history of heart

15   problems. He confirmed that Plaintiff had URC review before the pandemic and his treatment

16   had been postponed. The request was authorized by the URC on April 12, 2023, with a notation

17   that Plaintiff was scheduled for October 19, 2023. (ECF No. 25-1 at 34; ECF No. 25-3 at 3.)

18   Plaintiff sent a request on July 24, 2023, to see dental urgently due to rotting top teeth

19   and extreme pain. He was told he was on the dental list and that Tylenol and ibuprofen were

20   available in the canteen. (ECF No. 12 at 58.) He sent another request on July 31, 2023, stating

21   that he had rotten upper teeth that needed to be extracted since before the pandemic, and one of

22   those teeth was very loose and painful. He was told that he was referred to the oral surgeon and

23   scheduled August 2, 2023. (ECF No. 12 at 60.)

Plaintiff saw Dr. Dryden on October 19, 2023, who noted Plaintiff needed extraction of teeth 1, 3, 4, 6, 11, 12, 14, and 19 with local anesthesia, but Plaintiff needed to have a cardiology consultation. (ECF No. 25-1 at 31.) Dr. Dryden sent a letter dated October 24, 2023, requesting Plaintiff's cardiac status be evaluated regarding his ability to undergo dental extractions under local anesthesia. (ECF No. 25-1 at 46.)

He was seen by cardiology on October 30, 2023, who said Plaintiff needed to undergo a nuclear stress test, an echocardiogram was ordered as well as a follow up in two months. (ECF No. 25-1 at 47.) Dr. Benson recommended a follow-up with cardiology in two months. (ECF No. 25-1 at 38.) APRN Villegas requested a nuclear medicine stress test on October 31, 2023, which was authorized on November 8, 2023, with a notation it was scheduled for July 30, 2024 (some eight months after it was authorized). (ECF No. 25-2 at 47.)

On November 18, 2023, Plaintiff sent a request to Keast asking when he would have his heart stress test and oral surgery. He was told the cardiac stress test had been authorized and was pending scheduling, and then the oral surgery would need to be authorized and scheduled. (ECF No. 12 at 62.)

On February 21, 2024, Plaintiff asked if he had been approved for the stress test. (ECF No. 12 at 64.)

Plaintiff was admitted to the hospital for unrelated issues on March 19, 2024, but part of the instructions on discharge was a follow up with cardiology in a month. (ECF No. 25-1 at 16.)

Plaintiff submitted an informal grievance regarding his need for a stress test and dental extractions. The grievance was eventually rejected by Coss. (ECF No. 12 at 66-77.)

On August 4, 2024, Plaintiff was supposed to have his nuclear stress test, but he complained of chest pain and was sent to the emergency room for evaluation. (ECF No. 25-2 at

4-7.) After his discharge, APRN Villegas requested a follow up with cardiology. (ECF No. 25-2 at 2.)

Nothing further occurred until after the court conducted the hearing on Plaintiff's motion on September 27, 2024. While Plaintiff was seen for a cardiology follow up on October 16, 2024, he was not evaluated for his ability to undergo dental extractions either under local or general anesthesia. The cardiologist did note that Plaintiff had lost 20 pounds and was doing well and that he should have a re-check in three months. (ECF No. 40-2.) In the most recent status update, Defendants confirm that a further cardiology evaluation concerning Plaintiff's fitness to undergo general or local anesthesia has been ordered. The appointment has not been scheduled, but is expected to take place in the next 30 days. (ECF No. 42.) The court has ordered that Defendants provide a status update concerning this evaluation by December 30, 2024. (ECF No. 44.)

Plaintiff has likewise demonstrated a likelihood of success on this Eighth Amendment claim. There was a clear delay in getting Plaintiff the required cardiac evaluation to determine whether the dentist can proceed with the extractions that have apparently been recommended for years. Dr. Dryden first requested the cardiac evaluation in October 2023. Plaintiff did not go in for the stress test until some ten months later. The stress test ended up being cancelled, but Plaintiff still has not been evaluated for his cardiac fitness to undergo the dental extractions. In the meantime, Plaintiff has complained about rotting and painful teeth.

Given that Plaintiff is going to be seen in the next 30 days for a cardiac evaluation to determine his fitness to undergo either local or general anesthesia for his teeth extractions, it is recommended that his motion for injunctive relief be denied without prejudice. The court has ordered Defendants to provide a status update regarding this evaluation, and in the event

Defendants do not promptly follow through with the cardiac evaluation or subsequent dental extractions (assuming he receives cardiac clearance), Plaintiff may renew his motion for injunctive relief with respect to his dental extractions.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING WITHOUT PREJUDICE** Plaintiff's motion for TRO/PI (ECF No. 9).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: November 18, 2024

_____
Craig S. Denney
United States Magistrate Judge